# In the United States Court of Federal Claims

No. 25-1604
(Filed Under Seal: June 1, 2026)
Reissued: June 17, 2026*

|  |  |
|---|---|
| RICK AVIATION, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant, | ) |
|  | ) |
|  | ) |
| AVFUEL, INC., | ) |
|  | ) |
| Defendant-Intervenor | ) |
|  | ) |

*John Bradley Reaves*, and *Jacob Daniel Noe*, Reaves PLLC, Chesapeake, Virginia, for plaintiff.

*Jana Moses*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant.

*Jill McDowell*, Impresa Legal Group, Arlington, Virginia, for defendant-intervenor.

## OPINION AND ORDER

*SMITH*, Senior Judge

Government procurement law imposes strict deadlines and doles out harsh consequences toward late offers. Under the "late is late rule," federal agencies are prohibited from considering proposals that are received after the deadline in a solicitation expires. Consequently, federal agencies reject proposals submitted by contractors mere minutes—or even seconds—after a deadline lapses. Agencies also reject offers that are transmitted before a deadline but are received after the deadline passes. There are narrow circumstances under which agencies will consider late offers. Those narrow circumstances, however, must meet specific requirements. One of those requirements provides that late offers must be received before an award decision.

---

* An unredacted version of this Opinion was issued under seal on June 1, 2026. *See* ECF No. 56. The Court provided the parties with the opportunity to submit proposed redactions. *See* Joint Status Report, ECF No. 58. The Court accepted the parties' proposed redactions.

In this post-award bid protest, the Court considers whether a late offer should have been considered when an offeror's electronic submission never reached the designated email inbox in a solicitation before an agency made its award. Plaintiff Rick Aviation, Inc. ("RAI") challenges the Defense Logistics Agency's ("DLA") decision to exclude its proposal from consideration for a contract to procure jet fuel to support Department of Defense ("DoD") activities. RAI argues that the Government Control and Electronic Commerce exceptions to the "late is late" rule apply such that DLA arbitrarily and capriciously excluded its proposal from competition. RAI also claims that DLA evaluated proposals by using unstated criteria when it failed to include information regarding an offeror's email-authentication protocols in the solicitation. Finally, RAI contends that DLA abused its discretion by awarding the contract to defendant-intervenor Avfuel, Inc. ("Avfuel") when Avfuel allegedly failed to secure a valid fixed-based operator in connection with carrying out the contract.

Among other things, RAI seeks injunctive relief and an order requiring DLA to re-consider its proposal. Before the Court are the are the parties' cross-motions for judgment on the administrative record. *See* Pl.'s Mot. for J. on the Administrative R., ECF No. 36; Def.'s Cross-Mot. for J. on the Administrative R. and Resp. to Pl.'s Mot for J. on the Administrative R., ECF No. 45; Intervenor's Cross-Mot. for J. on the Administrative Record and Resp. to Pl.'s Mot. for J. on the Administrative R., ECF No. 46. For the following reasons, the Court **GRANTS** defendant and Avfuel's cross-motions, ECF Nos. 45 and 46, and **DENIES** RAI's motion, ECF No. 36.

## I.      BACKGROUND

### A.  The Solicitation.

On April 21, 2025, DLA issued Solicitation No. SPE607-25-R-0201 (the "Solicitation") as part of its Energy FEPEA Into-Plan (Purchase Program 2.3 EAST) Fuel Program. *See* Administrative Record ("AR"), ECF No. 32 at 31, 43. Under the Solicitation, DLA sought procurement of petroleum fuel products to support ongoing DoD and civilian agency activities at commercial airports across the United States and North America. *Id.* at 3. Offerors could bid between 122 line items, with each item representing a different airport. *Id.* at 45–81. Each airport location would "be evaluated and awarded independently from all other [] locations." *Id.* at 7–8. DLA encouraged prospective offerors to submit proposals for multiple line items. *Id.* at 234. Awards would operate as long-term requirements contracts with economic price adjustments to protect against fluctuations in labor or material costs. *Id.* at 11, 13.

The Solicitation also provided that DLA would award contracts to those "whose offer conforming to the solicitation will be most advantageous" by considering a proposal's technical acceptability and price. *Id.* at 38–39 (citing 48 C.F.R. § 52.212-2). To meet or exceed technical acceptability, DLA required offerors to "submit a Certificate of Analysis or Certificate of Quality demonstrating that the Offeror can meet the application specification for the product offered" based on DoD standards. *Id.* at 39. Price would be "based upon the lowest estimated total price for the requirements as solicited for the particular airport." *Id.* at 39, 96. In sum, contracts would be awarded to offerors "represent[ing] the best value from selection of the lowest priced proposal that is technically acceptable." *Id.* at 9 (citing 48 C.F.R. § 15.101-2). DLA intended to make awards without discussions. *Id.* at 96. It further cautioned offerors that failure to provide required documentation or information could render a proposal technically unacceptable. *Id.* Jamika Forde

was designated as the Contracting Officer and served as the primary point of contact for all communications and inquiries. *Id.* at 6, 20, 35, 97.

The Solicitation set a deadline for offerors to submit their proposals for May 23, 2025, at 1:00 p.m. Eastern Standard Time ("EST"). *Id.* at 96. DLA advised contractors to ensure their offers are "sent with enough time to be processed through the server." *Id.* Offerors also "*assume[d] all risk for any delay in transmission of their proposals*." *Id.* (emphasis added). Any offer received after the due date would be considered late and would generally not be considered. *Id.* at 96, 234–35. To submit their proposals, DLA requested that offerors submit their bids to Ms. Forde's email at: Jamika.forde@dla.mil. *Id.* Elsewhere in the Solicitation, contractors could send their offers to: DLA-Energy-PH.Requirements@dla.mil. *Id.* at 240. In that section, DLA warned that its email filtration system would scan for viruses and key words that could delay delivery of a bid. *Id.* Contractors, then, were "encouraged to verify receipt of e-mail offers by contacting the Contracting Officer prior to the solicitation closing time." *Id.*

DLA also instructed offerors to submit a Certificate of Analysis or Certificate of Quality from each supplier that verified its delivery of aviation fuel would satisfy DLA energy standards. *Id.* at 7, 241. Offerors who were not the Refueler or Fixed-Based Operator ("FBO") were also required to submit a Commitment Letter from its FBO. *Id.* By signing the letter, FBOs committed themselves to render refueling services on behalf of an offeror for the period of performance. *Id.* at 263.

**B. RAI and Avfuel Submit Their Offers and DLA Issues Award.**

On May 22, 2025, RAI emailed its proposal to DLA-Energy-PH.Requirements@dla.mil at 1:27 p.m. EST. *Id.* at 322. RAI bid on Line Item 75, which required 32,292,000 gallons of "Jet A w/FSII Fuel" and "Jet A w/o FSII" Fuel delivered to Newport News Williamsburg International Airport in Virginia ("KPHF"). *Id.* at 67, 318. The performance period would begin on October 1, 2025 and last until March 31, 2029. *Id.* at 6. One minute after its submission, RAI received an email from a Mail Delivery System stating that its proposal was successfully delivered to DLA-Energy-PH.Requirements@dla.mil. *Id.* at 321. RAI did not receive any communications from DLA after sending its offer.

Avfuel also submitted an offer for Line Item 75 that proposed services worth $96,404,219.88. *Id.* at 264–73, 300–01, 308. In its proposal, Avfuel listed Atlantic Aviation PHF ("Atlantic") as its FBO. *Id.* at 270. Avfuel also provided a signed commitment letter from Atlantic that pledged it would perform refueling services on behalf of Avfuel for the entire contract period. *Id.* at 270–71. Additionally, Avfuel attached a certificate of analysis that represented that its proposal would meet defendant's standards. *Id.* at 272–73. After the May 23, 2025, deadline passed, Ms. Forde checked both email inboxes. AR 318. She only found Avfuel's proposal for Line Item 75 and noted that "[t]here was no offer from [RAI] . . . in either inbox, nor any other email received from [RAI] between April 22, 2025 and May 23, 2025." *Id.* at 318–19.

DLA accepted Avfuel's proposal and awarded it the contract on August 19, 2025. AR at 299. In her letter, Ms. Forde wrote that Avfuel "submitted the lowest price technically acceptable proposal for [] CLIN [75]." *Id.* As part of its evaluation, DLA recommended a "complete award"

to Avfuel following pre-award technical and quality assurance surveys.  *Id.* at 290–92.[1]  DLA noted that Atlantic maintained a lease with KPHF "that is currently valid through end of FY 2026."  *Id.* at 290.  But its evaluators commented that Atlantic signed its commitment letter before a pre-award survey visit "stating support would be provided if the contract is awarded" to Avfuel for the entire performance period.  *Id.* at 290–91.  Both surveys concluded that Avfuel possessed the requisite equipment, personnel, and capability to fulfill Line Item 75.  *Id.*  RAI received no award notice.

### C. RAI Files Its Notice of Bid Protest and DLA's Subsequent Investigation of the Missing Proposal.

On September 23, 2025, DLA received a notification that RAI intended to file a bid protest challenging the award of Line Item 75.  *Id.* at 319.  In response, Ms. Forde checked both email inboxes again and did not find RAI's proposal in either inbox.  *Id.*  DLA then initiated an investigation by requesting assistance from the Defense Information Systems Agency ("DISA"). *Id.*  DISA is a mission partner of DLA who provides information technology services, including email services.  *Id.* at 316.  DLA's emails are processed by DISA's Enterprise Email Messaging Secure Gateway ("EEMSG") "where they are validated by verifying the Sender Policy Framework (SPF) configuration."  *Id.*  SPF "is an email authentication standard that uses DNS TXT records to specify which mail servers are authorized to send email on behalf of a domain."  *Id.*  DISA blocks emails that fail SPF configuration.  *Id.*

After opening an inquiry, DISA located RAI's proposal.  *Id.*  According to DISA EEMSG and ZND Lead Engineer Quang Trinh, DISA quarantined RAI's May 22, 2025, email "due to error by the sender."  *Id.*  Specifically, the "Header information" concluded that RAI's email did "not designate[] ███████████ as permitted sender."  *Id.*  Mr. Trinh then determined that RAI's "domain SPF record was not properly configured" which caused its proposal to be quarantined. *Id.*  Thus, RAI's proposal was "never relayed to DLA-Energy-PH.Requirements@dla.mil."  *Id.*

Based on DISA's findings, Ms. Forde concluded that RAI's proposal was late because "it was not received at the Government office designated in the solicitation before the closing date." *Id.* at 319.  Since DISA quarantined RAI's email due to a SPF error by the sender, RAI's offer never reached either email inbox specified in the Solicitation.  *Id.* at 319–20.  Under these circumstances, Federal Acquisition Regulations ("FAR") "prohibit[ed] DLA Energy from accepting [RAI's] late proposal because it was not received at the Government office designated in the solicitation before the award."  *Id.* at 320.  Ms. Forde also opined that RAI "could have avoided this situation by verifying DLA Energy's receipt of the email prior to the closing date, as encouraged by the Solicitation."  *Id.* at 320.

---

[1]    DLA's general pre-award survey recommended a "no offer" of Avfuel's proposal.  *Id.* at 287.  In that survey, DLA noted that while Avfuel satisfied technical and quality assurance requirements, it could not sufficiently provide into-truck capabilities.  *Id.*  Specifically, DLA concluded that Atlantic's "truck rack meter is not calibrated for POS" which made its Into-Truck operations infeasible.  *Id.* at 289.  A DLA evaluator also opined that Avfuel could not meet its delivery requirements due to Atlantic's available assets, which included its trucks and storage tanks.  *Id.* at 288.  However, the survey requested that an on-site pre-award survey be performed and that separate Into-Truck and Into-Plane surveys be conducted "so as to not interfere with the overall recommendation."  *Id.* at 287.

## II.    PROCEDURAL HISTORY

On September 25, 2025, RAI filed this suit and alleged, among other things, that DLA arbitrarily and capriciously rejected its proposal from consideration. *See generally* Compl. Avfuel moved to intervene in October 2025, which this Court granted. *See* Mot. to Intervene, ECF No. 16. Based on the parties' scheduling order, defendant filed the administrative record with the Court on January 22, 2026. *See* AR. Thereafter, RAI filed a motion to complete the administrative record. *See* Pl.'s Opposed Mot. to Complete. Administrative R., ECF No. 34. RAI moved for defendant to admit the header information that Mr. Trinh considered in his investigation to the administrative record. *Id.* at 2. It also requested "quarantine event logs, gateway logs, or incident reports demonstrating that RAI's e-mail was, in fact, quarantined by DISA." *Id.* Furthermore, RAI sought for defendant to add the confirmation email it received after submitting its proposal. *Id.* That email provides:



**Patricia bombaro**

| | |
|---|---|
| **From:** | Mail Delivery System <MAILER-DAEMON@dispatch1-usg1.ppe-hosted.com> |
| **To:** | DLA-Energy-PH.Requirements@dla.mil |
| **Sent:** | Thursday, May 22, 2025 1:28 PM |
| **Subject:** | Relayed: Solicitation SPE607-25-R-0201 KPHF Item 0075 |

This is the mail system at host dispatch1-usg1.ppe-hosted.com.

Your message was successfully delivered to the destination(s) listed below. If the message was delivered to mailbox you will receive no further notifications. Otherwise you may still receive notifications of mail delivery errors from other systems.

The mail system

<DLA-Energy-PH.Requirements@dla.mil>: delivery via pri-jeemsg.eemsg.mail.mil ████████████ ok: Message 85480142 accepted

*See* Index to the AR, ECF No. 43 at 3.[2] Defendant did not oppose inclusion of the header information, but it argued that the administrative record contained all materials used by Ms. Forde when she made her decision. *See* Def.'s Resp. to Pl.'s Mot. to Complete the Administrative R., ECF No. 37 at 2. Following a status conference, the Court ordered defendant to supplement the administrative record with RAI's proposed materials. *See* Feb. 25, 2026, Order, ECF No. 39. The Court also requested that both parties submit supplemental briefing regarding their views on how these new materials would impact this matter. *Id.*

While its motion to complete the administrative record was pending, RAI also filed its motion for judgment on the administrative record on February 13, 2026. ECF No. 36. Defendant and Avfuel filed their responses and cross-motions for judgment on the administrative record on March 27, 2026. *See* ECF Nos. 45, 46. RAI later filed a response to the cross-motions and a reply

---

[2]    All previous and subsequent references to these additional materials refer to the AR and their corresponding page numbers within the AR. RAI's confirmation email may be cited as "AR at 321."

5

in support of its own motion. *See* Pl.'s Reply Br., ECF No. 48. Written briefing concluded when defendant and Avfuel filed their reply briefs in April 2026. *See* Intervenor's Reply in support of Intervenor's Cross-Mot. for J. on the Administrative R., ECF No. 51; Def.'s Reply in support of Cross-Mot. for J. on the Administrative R., ECF No. 53. On April 29, 2026, the Court held oral argument on the parties' pending motions. *See generally* Oral Arg. Tr., ECF No. 55.

## III.    LEGAL STANDARDS

### A. Scope of Review Under Bid Protest Actions.

The Tucker Act confers jurisdiction on this Court "to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with [a] procurement . . . " 28 U.S.C. § 1491(b)(1). Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *CS 321 East 2nd Investors, LLC v. United States*, 178 Fed. Cl. 471, 483 (2025) (citing *Percipient.AI v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025)). This Court may award "any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

Bid protests are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Under the APA, a court will set aside a federal agency's decision that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004). Agency action is arbitrary and capricious when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). Such conduct lacks a rational basis when an agency failed to provide a "coherent and reasonable explanation of its exercise of discretion." *Id.* When challenging an award on the second ground, a plaintiff must show "a clear and prejudicial violation of applicable statutes or regulations." *Id.* Examples of arbitrary and capricious conduct include when a federal agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In addition, a Court must find that the challenged agency action was prejudicial to the contractor. *Bannum*, 404 F.3d at 1351. "The second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021). A protester suffers prejudice upon a showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted).

This Court will "interfere with the government procurement process only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1981).

6

In application, the "arbitrary and capricious standard . . . is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *see Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (requiring more than *de minimis* errors to obtain relief). Disappointed bidders bear "a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). If there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion. . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). In sum, a court will not substitute its judgment for that of the agency. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

### B. Motion for Judgment on the Administrative Record.

Under Rule 52.1 of the Court of Federal Claims ("RCFC"), "a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review." *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). Courts are required "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, genuine issues of material fact do not preclude the Court from entering judgment. *Id.* at 1355–56; *see id.* at 1356 (noting that unlike a motion under RCFC 56, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record. . . ."). Thus, courts must determine whether a party satisfied its burden of proof based on the record. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed Cir. 2018).

### C. Permanent Injunctions.

Courts may grant injunctive relief upon a showing that "(1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favor[] the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). While injunctive relief "is based on [the] four-factor test, a plaintiff's failure to achieve success on the merits is dispositive." *Kingfisher Sys., Inc. v. United States*, 145 Fed. Cl. 22, 34 (2019) (citing *PGBA*, 389 F.3d at 1228–29; *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008)).

## IV.    DISCUSSION

Much of RAI's lawsuit depends on whether DLA should have considered its late proposal. Submissions of late offers "after all other parties are required to do so" presents "inherent competitive advantages . . . such as access to post-deadline news and market information that could result in last minute changes to the proposal." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (2009) (citation omitted). Under the late is late rule, federal agencies are prohibited "from accepting a proposal, proposal modifications, or revisions after the deadline for proposals

established by the agency in a solicitation." *Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 172 n. 1 (2021).  Courts adhere "to the plain text of the regulation" and its mandate "that offerors submit their proposals on time is a strict rule with very limited exceptions." *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 640 (2007) (citations and quotations omitted).[3]  In doing so, an "untimely submission becomes a stranger to the process, and is disqualified from the procurement." *Labatt*, 577 F.3d at 1381.  Thus, late offers have "no 'substantial chance' of award, and no more standing to sue than the proverbial man on the street." *Id.*

As discussed below, FAR 52.212-1(f)(2)(i) provides limited exceptions to the late is late rule.  Those include the Government Control and Electronic Commerce exceptions which impose additional requirements.  FAR 52.212-1(f)(2)(i)(A)–(B) (codified at 48 C.F.R.).  Under the arbitrary and capricious standard of review, this Court cannot substitute its own judgment for that of Ms. Forde's just because it may have reached a different conclusion.  *Honeywell, Inc.*, 870 F.2d at 648.  Rather, the Court must address whether Ms. Forde lacked a rational basis when she concluded that DLA could not accept RAI's proposal at the time she made her decision.  *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 76 (2022) (citing *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

### A. RAI Failed to Demonstrate that It Satisfied Threshold Requirements for the Court to Consider whether an Exception to the Late Is Late Rule Applies.

Defendant and Avfuel asserted that RAI failed to comply with certain prerequisite conditions under FAR 52.212-1(f)(2)(i).  *See* ECF No. 45 at 7–11; ECF No. 46 at 9–12.  In their opinion, the Court need not address whether the Government Control and Electronic Commerce exceptions apply.  Resolving this issue turns on principles of statutory interpretation.

It is well-established that rules of statutory construction apply to interpreting regulations. *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017).  These "canons" are "no more than rules of thumb that help courts determine the meaning of [a regulation]." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).  Nonetheless, courts should "should always turn first to one, cardinal canon before all others." *Id.*  Under that fundamental canon, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sanifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979); *New York & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882 (Fed. Cir. 2018). If words to a regulation are clear and unambiguous, "the inquiry ends with plain meaning." *Hanser v. McDonough*, 56 F.4th 967, 970 (Fed. Cir. 2022) (citation omitted); *see Connecticut Nat. Bank*, 503 U.S. at 253 (describing in this situation that "this first canon is also the last.").

### 1. A Plain Reading of FAR 52.212-1(f)(2)(i) Shows a Series of Steps Must be Met for an Agency to Consider an Otherwise Late Proposal.

In relevant part, FAR 52.212-1(f)(2)(i), along with the two exceptions at issue, appear as follows:

---

[3]    Application of the late is late rule also "alleviates confusion" and promotes "equal treatment of all offerors." *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 173 (2005).

Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—

(A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

(B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers. . .

FAR 52.212-1(f)(2)(i)(A)–(B).  Going line by line, the regulation provides a framework for Courts to follow.  First, "[a]ny offer . . . *received at the Government office designated in the solicitation* after the exact time specified for receipt of offers *is 'late'* . . ." FAR 52.212-1(f)(2)(i) (emphasis added).  In plain English, this opening clause defines what constitutes a late offer: one that is received by the Government office after the deadline expired as stated in a solicitation.  Next, late offers "will not be considered unless. . ." *Id.*  Traditionally, the word "shall" represents mandatory language, while "may" refers to permissive language.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 112–15 (2012).  Although "shall" presents "a semantic mess," it has been interpreted to be "essentially equivalent to *will*." *Id.* at 112–13 (emphasis in original).  In this case, the Court finds that "will" in § 52.212-1(f)(2)(i) connotes a similar effect to "shall."  Under this reading, late offers *shall* not be considered *unless* certain conditions are met.

Those conditions include: (1) that a late offer be "received *before award is made*;" and (2) the "Contracting Officer determines that accepting the late offer *would not unduly delay the acquisition*." FAR 52.212-1(f)(2)(i) (emphasis added).  Section 52.212-1(f)(2)(i) also ends with the word "and" before listing specific requirements for the Government Control and Electronic Commerce exceptions.  *See* FAR 52.212-1(f)(2)(i)(A)–(B).  As a tenet of statutory interpretation, the word "and" joins a conjunctive list which requires all items to be satisfied.  *See* Scalia & Garner, *supra*, at 116 (citing *Harmelin v. Michigan*, 501 U.S. 957, 967 (1991)).  Therefore, a late offer must satisfy the first two conditions in § 52.212-1(f)(2)(i) *and* then meet the criteria in one of its exceptions to overcome the late is late rule.[4]  Indeed, this Court previously described FAR 52.212-1(f)(2)(i)'s express requirements as "qualifying conditions for the application of an exception to the 'late is late' rule." *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 702 (2016).

---

[4]    The Government Control Exception separates itself from its Electronic Commerce Exception counterpart with an "or." *See* FAR 52.212-1(f)(2)(i)(A)–(B).  "Or" creates a disjunctive list, which becomes satisfied upon completion of one item.  *See* Scalia & Garner, *supra*, 116 (2012).  Therefore, late offers need only satisfy one exception in addition to the two qualifying conditions for such offers to be considered.

### 2. DLA Reasonably Concluded that It Could Not Consider RAI's Late Proposal Because It Did Not Receive the Offer Before Awarding Avfuel the Contract.

Conceptually, both parties and the Court agree on how RAI's late proposal should be analyzed. *Compare* ECF No. 36 at 6, 8–9, 12; *with* ECF No. 45 at 7–11; ECF No. 46 at 9–12. However, the parties disagree on how that framework should apply under these circumstances. RAI argues that its offer "was received before award was made." ECF No. 36, at 9. It claimed that DISA's receipt and quarantine of its proposal satisfied FAR 52.212-1(f)(2)(i)'s first condition. *Id.*; ECF No. 48 at 6–7. By contrast, defendant asserts that RAI's proposal did not reach "the *designated Government office* in the Solicitation" before DLA made its award which "leaves no room for discretion" under the late is late rule. ECF No. 45 at 7 (emphasis added). Avfuel sided with defendant's interpretation and urges this Court to find that RAI's "reliance on the auto-generated receipt" it received after sending its offer did not prove receipt "at the email designated in the Solicitation." ECF No. 46 at 9–10.

This matter turns on two clauses in § 52.212-1(f)(2)(i). First, an offer becomes late when it is "received by the Government office designated in the Solicitation after the exact time specified for receipt of offers." FAR 52.212-1(f)(2)(i). Second, late offers "will not be considered unless it is received before award is made." *Id.* The "received before award is made" requirement lacks a destination. *See id.* Defendant interprets subparagraph (f)(2)(i) as "prescrib[ing] an integrated condition: [that a late] offer must be received at the Government office designated in the solicitation before award is made." ECF No. 53 at 3. Meanwhile, RAI posits that "the crux of this case" depends on "the distinction, if any, between the definitions of 'Government office," 'initial point of entry to the Government infrastructure,' and 'Government installation.'" ECF No. 48 at 6. The latter two terms appear in the Government Control and Electronic Commerce exceptions. FAR 52.212-1(f)(2)(i)(A)–(B). RAI claims that terminology from both exceptions modify Government office, depending upon which exception to the late is late rule applies. ECF No. 48 at 8. After careful consideration, the Court agrees with DLA and Avfuel's interpretation.

At the outset, when different parallel words appear "in the alternative in the same statutory provision, it is reasonable to assume that the words have different meanings." *Walton v. United States*, 551 F.3d 1367, 1370 (Fed. Cir. 2009). In cases involving physical delivery of offers, a designated Government office means the "particular location designated for the receipt of bids in the [Solicitation]." *Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 298 n. 33 (1998). A Government installation, by contrast, "refers to the entire government facility in which the 'designated office' is located." *Id.* When applied together, the Government Control exception "only makes sense if a proposal was sent from one part of a Government installation to the designated office by a Government agent in the ordinary course of business." *Shirlington Limousine & Transp., Inc. v. United States*, 77 Fed. Cl. 157, 171 (2007). As for electronic submissions, one Court defined Government office as "the e-mail address identified in the solicitation for receipt of proposals." *Conscoop-Consorzia Fra Coop. Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 238 (2004); *see also Watterson Const. Co. v. United States*, 98 Fed. Cl. 84, 93 n. 14 (recognizing that lateness is determined based on "when it reaches or is received by the responsible government official's email."). And courts have defined Government installation in this context as "the first server designated by the government to receive e-mails *directed to the address contained in a solicitation*." *Fed. Acquisition*, 124 Fed. Cl. at 704 (emphasis added).

Applying a similar logic to email submissions, some initial server would pass along an offer to the inbox listed in the Solicitation. Thus, each term carries its own distinct meaning.

RAI contends that interpreting each term independently "is contradictory" because it would impose "some added substantive hurdle." *Id.* But RAI's argument runs afoul of another canon of statutory construction: the "Scope of Sub-Parts Canon." This canon provides that "[m]aterial within an indented subpart relates only to that subpart; material contained in unindented text relates to all the following or preceding indented subparts." *See* Scalia & Garner, *supra*, at 156; *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 334 (2005). Here, FAR 52.212-1(f)(2)(i) appears as unindented text while the Government Control and Electronic Commerce exceptions appear in subsections (A) and (B) which are indented.[5] Taken together, § 52.212-1(f)(2)(i) and its two qualifying conditions apply to all indented exceptions. At the same time, indented language found in subsections (A) and (B) do not interact with each other, nor do they modify FAR 52.212-1(f)(2)(i) above. Nowhere does § 52.212-1(f)(2)(i) allow for these terms to replace or modify each other's meaning either. Therefore, RAI cannot use language found in the Government Control and Electronic Commerce exceptions to read-in a favorable interpretation of FAR 52.212-1(f)(2)(i)'s conditions. *See* ECF No. 48 at 8.[6]

As observed by defendant, RAI conflates FAR 52.212-1(f)(2)(i) with criteria found in the Government Control exception. ECF No. 45 at 7. Indeed, RAI believes that its offer was received before DLA made its award because it "was within the government's control but [] was not forwarded to [the] intended recipient." ECF No. 36 at 9.[7] RAI relies on the Court's decision in *Fed. Acquisition* for support. There, DISA attempted to transmit a contractor's offer to a federal agency, but the email "bounced back as 'undeliverable'" because it exceeded the file size limit outlined in the Solicitation. *Fed. Acquisition*, 124 Fed. Cl. at 693–94. That case concerned whether a proposal "was received at the Government installation designated for receipt of offers . . . for purposes of the Government Control exception." *Id.* at 703–04. However, "the *two qualifying conditions* for the application of an exception to the 'late is late' rule" were not disputed. *Id.* at 702 (emphasis added). An order mandated that the federal agency accept the contractor's "proposal for evaluation [which] resulted in the agency receiving the proposal before award and the procurement was not unduly delayed." *Id.* These facts do not appear here.

Furthermore, RAI claims that its offer was received "at the Government office before an award was made" because DISA intercepted and quarantined its email. ECF No. 48 at 7 (quotations omitted). By flagging its email, RAI's proposal "was physically present in the government's email infrastructure . . . long before any award decision was ever made." *Id.* Again, "Government office designated in the Solicitation" relates to Ms. Forde's and DLA Energy's email addresses, not DISA servers. AR at 96, 240. Next, RAI argues that it "can hardly be held responsible for knowing that a different agency might nevertheless intercept [its] proposal." *Id.* at

---

[5]    *See 52.212-1 Instructions to Offerors—Commercial Products and Commercial Services*, Acquisition.Gov, https://www.acquisition.gov/far/52.212-1, (last visited Mar. 13, 2026).

[6]    "[L]ittle or no heed should be given" to the Scope of Sub-Parts Canon if circumstances suggest "that the formatting was not something that the drafters of the text enacted." *See* Scalia & Garner, *supra*, at 156. The Court finds no compelling reason to support a contrary finding.

[7]    This assertion further proves that RAI implicitly recognized that a difference exists between Government office and Government installation. It also shows that RAI acknowledged that its offer never reached the email address listed in the Solicitation.

8.  Neither FAR 52.212-1(f)(2)(i), nor its exceptions, contemplate a contractor's knowledge of potential obstacles to receipt.  FAR also does not incorporate any fairness considerations and Courts are instructed to strictly interpret the late is late rule.  RAI then discusses perceived analogous facts in *Fed. Acquisition* and distinguishes this matter from *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512 (2025), *reconsideration denied*, 180 Fed. Cl. 233 (2026).  ECF No. 48 at 8–10.  Once more, RAI combines concepts from the Government Control exception's specific criteria to FAR 52.212-1(f)(2)(i)'s general conditions.  While it may be a "crystal [sic] clear distillation" under that exception, RAI's analysis stops short of convincing the Court that its proposal was received at the "Government office designated in the Solicitation" before an award was made.  *Id.* at 9.  Finally, RAI contends that DLA designated DISA as "the first server to receive emails directed to the addresses contained in the Solicitation."  ECF No. 48 at 9.  On these lines, DISA served as an "agent, or functional equivalent, of DLA itself."  *Id.*  RAI failed to develop this argument, nor did it offer any supporting evidence that DLA arranged for DISA to serve as its agent.  These "[c]onclusory assertions and speculation" do not satisfy RAI's high burden.  *VSolvit, LLC v. United States*, 151 Fed. Cl. 678, 690 (2020); *Impresa*, 238 F.3d at 1332.[8]

Whether a late offer was received by a federal agency before award does not appear to be a highly litigated issue.  Indeed, most cases address the application of, or distinction between, the Government Control, Electronic Commerce, and other exceptions to the late is late rule.  But this precedent helps confirm the Court's conclusion.[9]  It reasonably follows that disappointed contractors cannot graft language from separate exceptions to a main provision to suit their individual needs.  That would favor an overly expansive interpretation of the late is late rule which past Courts have confined to narrow circumstances.  *See Insight Sys.*, 110 Fed. Cl. at 574.  When reading FAR 52.212-1(f)(2)(i), "received before award is made" relates back to the general rule

---

[8]  RAI also argued that considering its offer "would not have unduly delayed the acquisition because [its] offer was received by 5:00 p.m. one working day before offers were due."  ECF No. 36 at 11 (emphasis omitted).  It later notes that DLA and Avfuel offered no response to this point.  ECF No. 48 at 13.  While DLA and Avfuel did waive their opportunity to address RAI's argument, the Court also believes that RAI failed to develop this assertion such that it waived this point as well.  *See SmartGene, Inc. v. Advanced Biological Lab'ys, SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014).  RAI glossed over the fact that Ms. Forde and DLA did not become aware of its proposal until September 2025, almost a month after DLA had awarded the contract.  AR at 319.  Ms. Forde also did not make her decision until January 2026, or almost five months post-award.

[9]  Many cases that applied the late is late rule arose from pre-award bid protests.  *See Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 570–72 (2013); *Watterson Const.*, 98 Fed. Cl. at 87; *Cal. Marine*, 42 Fed. Cl. at 286–87; *Conscoop-Consorzia*, 62 Fed. Cl. at 222–23; *KGL Food Servs. WLL v. United States*, 153 Fed. Cl. 497, 505 (2021); *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 157 (2012); *Syncon, LLC v. United States*, 154 Fed. Cl. 442, 448 (2021); *FreeAlliance.com, LLC v. United States*, 159 Fed. Cl. 506, 509 (2022).  Other Courts reviewed late proposals in post-award bid protests.  *Kropp Holdings*, 176 Fed. Cl. at 512; *Competitive Innovations, LLC v. United States*, 177 Fed. Cl. 717, 726–27 (2025); *HII ShipCycle, LLC v. United States*, 180 Fed. Cl. 315, 320–21 (2026).  Those cases largely shared a similar quality—that a late offer eventually reached the Government office designated in the Solicitation.  It seems noteworthy that whether an offer was received before award was not discussed.  Two cases involved proposals that never reached their final destination.  *See Fed. Acquisition*, 124 Fed. Cl. at 694; *Naval Sys., Inc. v. United States*, 153 Fed. Cl. at 187.  But the federal agencies either conceded or were ordered to accept the contractor's late proposals, thereby receiving those offers before award.  *Id.*  RAI also conceded this point as well.  Oral Arg. Tr. at 10:13–16.

that late offers are those received by the Government office designated in a solicitation. Accordingly, a contractor must show that their bid arrived at the email address designated in the Solicitation before award.

Here, the Solicitation designated Ms. Forde's and a DLA Energy email address for offerors to submit their proposals. AR 96, 240. The Solicitation also listed May 23, 2025, at 1:00 p.m. EST as the deadline to submit offers. *Id.* at 96. DLA did not award Line Item 75 to Avfuel until August 19, 2025. *Id.* at 299. Thus, DLA must have received RAI's offer at DLA-Energy-PH.Requirements@dla.mil on or before that date. *Id.* at 240. When reviewing Ms. Forde's January 2026 decision, RAI failed to demonstrate that she lacked a rational basis to exclude its offer.

On May 23, 2025, Ms. Forde checked both email inboxes listed in the Solicitation after the deadline for offers expired. *Id.* at 318. For Line Item 75, she only found Avfuel's offer. *Id.* When DLA awarded Avfuel the contract, Ms. Forde recalled that DLA "had not received the proposal from Rick Aviation, nor any other email or phone call." *Id.* at 319. When RAI notified DLA that it intended to file a bid protest on September 23, 2025, Ms. Forde checked both inboxes again and found no proposal from RAI. *Id.* As incorporated into her decision, Mr. Trinh determined that RAI's "May 22 email was quarantined by *DISA's* network due to an SPF error by the *sender*." *Id.* at 316 (emphasis added). According to Mr. Trinh, DISA blocked RAI's email and never relayed it to DLA because the email failed SPF verification. *Id.* The "message Header" reflected this result by characterizing RAI's offer as "Received-SPF: Fail." AR at 316, 322. With this information, Ms. Forde concluded that RAI's offer "was not received at the Government Office designated in the solicitation before the award" which prohibited DLA from accepting RAI's late proposal. *Id.* at 320.

Against this backdrop, DLA did not receive RAI's bid before award, and it arguably did not receive RAI's offer *at all*. *See* ECF No. 51 at 3. Mr. Trinh did not clarify whether he forwarded RAI's proposal to DLA in December 2025. Regardless, a "late proposal is tantamount to no proposal at all." *Labatt*, 577 F.3d at 1381. Ms. Forde and DLA also did not become aware of RAI's offer until over a month after Avfuel had received award and approximately a week before performance began. AR at 319. All of DLA's actions with respect to RAI's offer took place after it awarded Avfuel Line Item 75. Therefore, under a plain reading of FAR 52.212-1(f)(2)(i), RAI's late offer could not have been received prior to award and could not be considered.

In response, RAI presented one contradicting piece of evidence. After it submitted its proposal, RAI received a "delivery confirmation at 1:28 p.m. on May 22, 2025." ECF No. 36 at 11; AR at 321. According to RAI, defendant sent that confirmation receipt. ECF No. 48 at 1, 12; Oral Arg. Tr. at 5:11–25, 14:2–4. However, the confirmation came from "the mail system at host dispatch . . ." AR at 321. RAI did not establish the identity of "host dispatch1" or prove that DLA or DISA originated this email. And aside from its assertion, RAI did not provide any evidence that substantiates its point. *See also* Oral Arg. Tr. at 21:8–18 (providing defendant's position that host means RAI's server). At best, RAI's confirmation email could show that its offer reached DISA's servers. *See* AR at 321. But this does not establish that DLA Energy's email address received its proposal. While this Court ordered defendant to admit RAI's confirmation email, the Court also must reconcile this evidence with its standard of review. Ms. Forde did not possess, nor was she aware of, RAI's confirmation email. This Court will not substitute its own judgment for that of Ms. Forde's, and it will consider the facts before her at the time DLA made its procurement

decision.  *IAP Worldwide*, 160 Fed. Cl. at 76.  Still, evaluating RAI's confirmation email did not overcome its heavy burden to set aside the procurement.  *Impresa*, 238 F.3d at 1332.

In addition, Mr. Trinh determined that RAI's SPF error occurred because it failed to designate "███████████ as permitted sender."  AR at 316.  Such SPF configuration "is a *sender-side* security measure" that is implemented to "prevent unauthorized use of an email domain for sending spam, phishing emails, and other malicious messages."  ECF No. 45 at 11 (emphasis added).  DISA's EEMSG system verifies inbound emails "*before* messages reach a user's inbox for firewall purposes."  *Kropp Holdings*, 176 Fed. Cl. at 536 (emphasis in original).  When DISA catches a suspicious email, "[t]here is no guarantee that an email that enters the EEMSG will be delivered to the recipient's inbox, *or even be retrievable by the recipient*, because the vast majority of emails sent through the EEMSG are blocked for firewall purposes."  *Id.* at 537 (emphasis added).  In fact, "[o]ver 85% of Inbound email is dropped due to sender reputation" by DISA.  *Id.* at 538.  Indeed, the "black hole effect is a symptom of the sending party's [].  The vendor sends an email, DLA never receives it, it never hits our email servers, and the vendor does not receive an indication that their message was not delivered."  *KGL Food Servs.*, 153 Fed. Cl. at 504.

DISA's gateway logs indicate that it blocked RAI's email which means it never reached a DLA server.  AR at 316, 322–25.  RAI's confirmation email also said its message was delivered but not received.  AR at 321.  In ordinary terms, delivery contemplates a transfer of title or relinquishing control, whereas receipt entails coming into possession of something.[10]  As evidenced when DISA quarantined RAI's email, delivery is a necessary but insufficient condition to receive an email.  RAI also admitted that DISA "set aside" its proposal and never forwarded it to DLA's email inbox.  Oral Arg. Tr. at 9:3–7.  Semantics aside, RAI's email fails to defeat Ms. Forde's testimony that she never found RAI's proposal in either inbox.  Since contracting officers must evaluate proposals before making award, it seems reasonable that they should actually receive a late offer before they make their decision.

On a broader level, Courts have grappled with construing the late is late rule too narrowly, "particularly where some government failure or breakdown is the evident cause of the lateness of a submission, [which] introduces its own discomforting unfairness and arbitrariness."  *Insight Sys.*, 110 Fed. Cl. at 575.  Those concerns do not exist here.  RAI failed to explain why its SPF protocols failed.  It proffered no evidence that DISA caused its authentication protocols to become defective, nor did it show that its SPF framework was properly configured.  As for its offer, Ms. Forde lacked knowledge that RAI would bid on Line Item 75, and it was unreasonable for her to ask DISA to check for quarantined bids.  Unwinding procurements when a contracting officer and agency never received, were notified, or were placed in a position to consider an otherwise late proposal, after making award would also introduce "its own discomforting unfairness and arbitrariness."  *Id.*

---

[10]    *Deliver*, The Britannica Dictionary, https://www.britannica.com/dictionary/deliver, (last visited May 1, 2026) (characterizing deliver as "to give control (someone or something) to another person or group."); *see also Watterson Const.*, 98 Fed. Cl. at 93 n. 14 (suggesting that timing of late is late rule should be determined when offeror relinquishes control of their offer); *Receive, Black's Law Dictionary* (12th ed. 2024) (defining receive as "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source.").

Therefore, RAI's confirmation email does not prove that DLA received its proposal before it awarded Avfuel the contract.

This result may seem harsh. Another Court commented that disputes like this one have arisen "with disturbing frequency" that "painfully illustrate" how FAR provisions enacted long ago conflict with modern technology. *See Insight*, 110 Fed. Cl. at 568 (2013). But "[o]ccasional errors in computer systems are a fact of life." *Conscoop-Consorzia*, 62 Fed. Cl. 219. While electronic submissions may provide greater convenience for contractors, "this perceived advantage may create a false sense of security, resulting in problems" due to technical glitches. *Id.* And for a protocol as ubiquitous as SPF configuration, the same holds true.[11]  FAR also expressly places responsibility on offerors to ensure their proposals reach "the Government office designated in the solicitation by the time specified in the solicitation." FAR § 52.212-1(f)(1). DLA encouraged offerors to verify that their bids had been received with the Contracting Officer too. AR at 96, 240. It further cautioned that offerors "assume[d] all risk for any delay in transmission of their proposals." *Id.* at 96. Unlike other cases, RAI never followed up with Ms. Forde or an official at DLA to confirm receipt of its offer. It therefore assumed the risk that its offer would not be received by DLA Energy's email address due to delays and technical defects. Defendant even conceded that its offer may have been timely that had RAI followed up with Ms. Forde. Oral Arg. Tr. at 22:11–14, 25:3–9.

Therefore, the Court concludes that DLA did not receive RAI's proposal before it awarded Avfuel the contract and Ms. Forde's decision to not consider RAI's late proposal was not arbitrary nor capricious. Since DLA did not receive RAI's offer before it awarded Avfuel the contract, RAI cannot succeed under the Government Control of Electronic Commerce exceptions. Accordingly, the Court **GRANTS** defendant and Avfuel's motion for judgment on the administrative record and **DENIES** RAI's motion for judgment on the administrative record on this issue.

**B. An Offeror's SPF Configuration Does Not Qualify as Unstated Evaluation Criteria that DLA Omitted from the Solicitation.**

Next, RAI claims that DLA implemented unstated evaluation criteria when it failed to provide an SPF requirement in its Solicitation. ECF No. 36 at 13–14. According to RAI, "if offerors were never notified of this SPF configuration requirement, how could they reasonably be excluded from the competition based on a given SPF configuration?" *Id.* at 13.

"It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 47 (2009) (citations and quotations omitted); 41 U.S.C. § 3701; 48 C.F.R. § 15.305. Procurement decisions that apply unstated evaluation criteria not found in a solicitation are arbitrary and capricious. *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) (citing *NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015)). To establish this claim, a plaintiff must show that an agency "used a significantly different basis in evaluating the proposals than was disclosed." *Wellpoint Mil. Care Corp. v. United*

---

[11]    *See* Andrew Bonar, *Unmasking Lazy Gatekeepers: What 12 Million SPF Records Reveal About Email Security*, emailexpert, https://emailexpert.com/unmasking-lazy-gatekeepers-what-12-million-spf-records-reveal-about-email-security/, (June 12, 2025) (describing SPF as a "longstanding standard in email authentication" and discussing growing trends with issues related to SPF misconfiguration).

*States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020).  However, a solicitation "need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors."  *Samsara*, 169 Fed. Cl. at 319.

Courts have addressed unstated evaluation criteria claims regarding substantive requirements in a solicitation.  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1357 (Fed. Cir. 2004); *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 446 (2022); *Centerra Sec. Servs. GmbH v. United States*, 176 Fed. Cl. 219, 235 (2025); *Sterling Med. Assocs., Inc. v. United States*, 177 Fed. Cl. 550, 569 (2025); *Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 686 (2023), *aff'd*, No. 2023-1992, 2024 WL 4100253 (Fed. Cir. Sept. 6, 2024).  Defendant argues that "SPF configuration is not a substantive requirement for proposals in any sense."  ECF No. 45, at 18.  Because it disregarded RAI's proposal, "DLA could not have applied unstated evaluation criteria to a proposal it never received."  *Id.* at 16.  Similarly, Avfuel asserts that SPF authentication serves as "a pre-inbox, gateway delivery event," not a "criterion used to 'evaluate' the contents of RAI's proposal."  ECF No. 46 at 18.

This Court has previously held that unstated evaluation criteria claims apply to non-substantive requirements.  *See eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 379–81 (2022).  RAI did not discuss *eSimplicity* in its briefing and instead waited until oral argument to raise it.  ECF No. 36 at 13–14; ECF No. 48 at 19–20.  There, a solicitation listed formatting requirements for offers, but not a file size limit.  *eSimplicity*, 162 Fed. Cl. at 377.  A contractor then submitted its proposal by email, but it never reached its destination server because it was "bounced back" after exceeding the maximum file size.  *Id.*  The Court held that the agency used unstated evaluation criteria when it failed to disclose a file size limit because it was "plainly a factor . . . that . . . affect[ed] contract award."  *Id.* at 380 (quotations omitted) (citing 48 C.F.R. § 15.304(d)).

When reaching its decision, *eSimplicity* cited FAR 15.304(d).  That subsection mandates that "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation."  48 C.F.R. § 15.304(d).  A broad reading could support a finding that a SPF requirement qualifies as a "factor" that would affect contract award.  But upon closer examination, FAR provides further guidance.  Within § 15.304, another provision describes evaluation factors and significant subfactors as those that: (1) "[r]epresent the key areas of importance and emphasis to be considered in the source selection; and (2) [s]upport meaningful comparison and discrimination between and among competing proposals."  48 C.F.R. § 15.304(b)(1)–(2).  As provided by the Solicitation, technical acceptability and price represent the key areas of importance and emphasis.  AR at 38–39.  Under FAR's criteria, an offeror's SPF framework does not represent any area that DLA would consider.  SPF configuration would also not help DLA determine whether RAI provided "the best value from selection of the lowest priced proposal that is technically acceptable."  AR at 9.  Additionally, SPF configuration does not support any meaningful comparison between proposals because DLA could not compare a proposal that it never received.  Broadening FAR's definition of evaluation factors in this instance does not comport with analyzing an unstated evaluation criteria claim.  Therefore, the Court finds *eSimplicity* inapplicable to this matter.

Without RAI's bid, DLA "could not lawfully consider" the "late, undelivered proposal."  ECF No. 45 at 17.  The Court agrees that SPF configuration was not "a basis in evaluating [] proposals within the meaning of the unstated-criteria legal test."  ECF No. 46 at 18–19.  While

SPF configuration does not qualify as evaluation criteria, it arguably amounts to an intrinsic element to electronically submitted offers. As a sender-side, security tool, SPF "improves email deliverability, strengthens domain reputation, and protects recipients from spoofed emails." ECF No. 45 at 11–12. It seems logical that DLA expected offerors to have functioning email systems that send non-suspicious or deceptive-looking communications. And amid an environment in which phishing and malicious emails have become rampant, it seems imputed that recipients like defendant would quarantine inbound communications based on a standard security tool used by senders like SPF. *See Kropp Holdings*, 176 Fed. Cl. at 537–38. A common protocol like SPF configuration is something that RAI could have anticipated. *See eSimplicity*, 162 Fed. Cl. at 377.

In opposition, RAI asserts that DLA first disclosed the defects in its SPF configuration through Mr. Trinh's declaration. ECF No. 48 at 19. By failing to notify RAI "of any supposed defect in its email transmission,"[12] DLA's quarantine justification "is a classic *post hoc* rationalization, and should be entitled no weight." *Id.*; *see Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 208; *IAP Worldwide*, 160 Fed. Cl. at 76. This argument fails on its face. On January 13, 2026, Ms. Forde wrote her determination letter in which she represented that DLA would not consider RAI's proposal. AR at 319. She incorporated Mr. Trinh's declaration, which concluded that DISA quarantined its proposal. *Id.* at 316. That declaration was dated December 19, 2025, or before Ms. Forde acted. *Id.* at 317. And as noted by Avfuel, Ms. Forde's use of DISA's findings "corroborate and explain why RAI's proposal was never received." ECF No. 46 at 20 (emphasis omitted).

Therefore, the Court concludes that DLA's failure to include an SPF configuration requirement in the Solicitation does not constitute unstated evaluation criteria.

## C. This Court Lacks Article III Standing to Hear RAI's Remaining Claim Regarding DLA's Evaluation of Avfuel's Proposal.

Finally, RAI alleges that DLA's evaluation of Avfuel's offer fails to comply with the terms of the Solicitation. ECF No. 36 at 14–15; ECF No. 48 at 20–21. Since Atlantic's lease with KPHF expires in 2026, Atlantic allegedly does not qualify as an FBO such that DLA abused its discretion in awarding Avfuel Line Item 75. ECF No. 36 at 15. However, RAI lacks standing to bring this claim which now deprives the Court of subject-matter jurisdiction.

Subject-matter jurisdiction, "because it involves a court's power to hear a case, can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Accordingly, a court "may raise sua sponte, subject matter jurisdiction at any time." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008). If the Court determines it lacks subject-matter jurisdiction, then it must dismiss the claim. RCFC 12(h)(3).

Article III, section 2 of the United States Constitution limits "federal judicial power to the resolution of actual 'cases' or 'controversies.'" *Anderson v. United States*, 344 F.3d 1343, 1359

---

[12]    RAI questioned the validity of DISA's finding that its SPF configuration failed such that DISA quarantined its offer. ECF No. 48 at 19. In doing so, RAI provided no response to DISA's declaration that could be construed as a developed argument. It also neglected to cite any evidence in the record that would yield a different conclusion. Therefore, RAI waived this argument. *SmartGene*, 555 F. App'x at 954.

(Fed. Cir. 2003); *Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). In other words, courts retain jurisdiction over matters that affect "the legal relations of parties having adverse legal interests." *Id.* (citing *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240–241 (1937)). "[I]t is axiomatic that a federal court may not address the merits of a legal question not posed in an Article III case or controversy, and that a case must exist at all stages of" litigation. *eSimplicity, Inc. v. United States*, 122 F.4th 1373, 1376 (Fed. Cir. 2024). This Court, though an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III." *Anderson*, 344 F.3d at 1350 n. 1 (citing *Glass v. United States*, 258 F.3d 1349, 1355–56 (Fed. Cir. 2001)). Like other justiciability precepts, standing is jurisdictional and cannot be waived. *Media Techs. Licensing, LLC. v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) (citations omitted). While courts address standing at the start of a lawsuit, a plaintiff must maintain standing "at all stages of review." *Id.* (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 67 (1997); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Standing under Article III requires a showing of: "(1) an injury-in-fact; (2) that is causally linked to the challenged action; and (3) redressable by a favorable ruling." *Monbo v. United States*, 175 Fed. Cl. 440, 455 (2025) (citing *Lujan*, 504 U.S. at 560–61). Put differently, a plaintiff must establish "a personal stake in the alleged dispute." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). To do that, plaintiffs "must be able to sufficiently answer the question: What's it to you?" *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1318 (Fed. Cir. 2025) (citations and quotations omitted). An injury-in-fact "is an invasion of a legally protected interest that is both (1) concrete and particularized as well as (2) actual or imminent, not conjectural or hypothetical." *Bos. Edison Co. v. United States*, 64 Fed. Cl. 167, 179 (2005) (citations and quotations omitted). A redressable injury is one that is "likely, as opposed to merely speculative, that will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotations omitted).[13] Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted).

This Court already held that DLA's decision to reject RAI's late proposal was not arbitrary and capricious. It also concluded that DLA did not implement unstated evaluation criteria by failing to include a SPF configuration requirement in the Solicitation. RAI's remaining claim relates to DLA's evaluation of Avfuel's bid. ECF No. 36 at 14–17; ECF No. 48 at 20–22. After finding RAI's proposal constituted a late offer, its "submission becomes a stranger to the process,

---

[13]     A disappointed bidder must also establish statutory standing when bringing a bid protest under 28 U.S.C. § 1491(b)(1). *Acetris Health, LLC v. United States*, 949 F.3d 719, 727 (Fed. Cir. 2020). Statutory standing imposes more "stringent requirements" than its constitutional counterpart. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). First, a plaintiff must show that it is an "interested party." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (citations and quotations omitted). There, a plaintiff must demonstrate (1) that it is "an actual or prospective bidder;" and (2) "has a direct economic interest in the procurement or proposed procurement." *Id.* (citations and quotations omitted). In this context, a party has a direct economic interest upon a showing that it "had a substantial chance of winning the contract." *Id.* Second, a plaintiff must establish that it was prejudiced by a significant error in the procurement. *Labatt*, 577 F.3d at 1378. In 2023, the Federal Circuit held that statutory standing "does not implicate a court's subject-matter jurisdiction." *CACI, Inc-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023). Instead, challenges to statutory standing must be brought under RCFC 12(b)(6). *Monbo*, 175 Fed. Cl. at 451. Defendant and Avfuel do not argue that RAI lacks statutory standing in this case, so the Court will only address Article III standing.

and is disqualified from the procurement." *Labatt*, 577 F.3d at 1381 (noting that the court's discussion in that case addressed statutory standing).  Thus, RAI no longer possesses a personal stake in the outcome of its lawsuit.  *Raines*, 521 U.S. at 819.  Because it cannot be awarded the contract, RAI lacks a concrete and particularized injury-in-fact as it relates to Avfuel's award. *Monbo v. United States*, 175 Fed. Cl. at 455 (finding bid protestor lacked standing because its sole proprietorship was "debarred" and therefore precluded from receiving award).   RAI also cannot demonstrate that it suffered a redressable injury because it again cannot be awarded the contract even if the Court ruled in its favor.  *Id.*

Therefore, the Court holds that it lacks standing to hear RAI's remaining claim such that it must dismiss the claim for lack of subject-matter jurisdiction.

### D. RAI's Failure to Succeed on The Merits Obviates the Need to Evaluate the Remaining Factors for Granting Injunctive Relief.

While each factor for granting injunctive relief is not dispositive, the Federal Circuit has held that a movant is not entitled to such relief "if he fails to demonstrate a likelihood of success on the merits."  *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004); *see Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Argencord*, 68 Fed. Cl. at 176–77; *Career Training*, 83 Fed. Cl. at 219.  Courts may not use "an exceptionally weighty showing on one of the other three factors" to grant a permanent injunction if the movant cannot succeed on the merits.  *Nat'l Steel*, 357 F.3d at 1325.  Because RAI cannot prevail on the merits, the Court need not address the other permanent injunction factors.  Therefore, the Court holds that enjoining performance of Line Item 75 would be improper.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that RAI's proposal was never received by DLA before it awarded Avfuel the contract.  Accordingly, DLA's decision to not consider its untimely submission under the late is late rule was not arbitrary nor capricious.  In addition, DLA's omission of any SPF configuration requirement in the Solicitation did not subject RAI to unstated evaluation criteria.  And since RAI cannot recover or receive relief from setting aside DLA's procurement decision, it therefore lacks standing to challenge DLA's evaluation of Avfuel's proposal.

Therefore, the Court **GRANTS** defendant and Avfuel's cross-motions for judgment on the administrative record, ECF Nos. 45, 46.  The Court also **DENIES** RAI's cross-motion for judgment on the administrative record, ECF No. 36.  The Clerk of the Court is further directed to **ENTER JUDGMENT** in favor of defendant and Avfuel consistent with this Order.  The parties are directed to **FILE** a joint status report on or before **June 15, 2026**, that proposes redactions to this Opinion to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge